**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Patrick Newman, | No. CV 18-00481-PHX-DGC (DMF) |
| Plaintiff, | |
| v. | **ORDER** |
| Charles L. Ryan, et al., | |
| Defendants. | |

Plaintiff Patrick Newman, who is currently confined in the Arizona State Prison Complex (ASPC)-Eyman, South Unit, in Florence, Arizona, brought this civil rights action pursuant to 42 U.S.C. § 1983. Defendant Corizon Health, Inc. ("Corizon") moves for summary judgment. (Doc. 59.) Newman was informed of his rights and obligations to respond pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) (Doc. 61), and he opposes the Motion. (Doc. 68.) The Court will deny the Motion for Summary Judgment.

## I. Background

On screening of the two-count Second Amended Complaint under 28 U.S.C. § 1915A(a), the Court determined that Newman stated Eighth Amendment medical care claims against Corizon in Count One and Dr. Kevin Craig in Count Two and directed these Defendants to answer these claims. (Doc. 14.) The Court dismissed the remaining claims and Defendants. (*Id.*) The Court subsequently dismissed Defendant Craig without prejudice due to lack of timely service. (Doc. 71.)

Newman's claims against Corizon stem from its alleged failure to provide proper medical care for his brain tumor and his related vision issues for two years, despite his making repeated complaints and filing numerous HNRs requesting proper care. (Doc. 13 at 3−6.) Newman alleges that, as a result of Corizon's failures, he suffered eye infections, daily greenish-yellowish discharge, extreme headaches, loss of vision, daily pain in his head, and confusion in the brain. (*Id.* at 3.)

## II.    Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*,

1   477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw

2   all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited

3   materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

4   **III.   Facts**

5       Newman is a prisoner in the custody of the Arizona Department of Corrections

6   (ADC).  (Doc. 60 (Def. Statement of Facts) ¶ 1.)  On December 18, 2015, he was seen by

7   Corizon medical provider Ryan Brower in the Chronic Care Clinic for his high blood

8   pressure, and he reported having a large bump on his forehead just above the left eyebrow.

9   (*Id.* ¶ 2; Doc. 60-1 at 2; Doc. 68 (Pl. Statement of Facts) ¶ 2.)[1]  Newman denied nausea,

10  vomiting, diarrhea, constipation, shortness of breath, cough, or fever, and reported previous

11  sinus surgeries.  (Doc. 60-1 at 2.)  He told Brower he thought the bump on his forehead

12  was related to an infection for which he was being worked up for surgery prior to his

13  incarceration, but Brower told him it was only inflammation of fatty tissue.  (*Id.* at 2−6;

14  Doc. 13 at 3.)  Newman also told Brower that he was in severe pain.  (Doc. 13 at 3.)

15      On December 29, 2015, Newman filed an Emergency Health Needs Request (HNR)

16  in which he requested a bottom bunk.  (Doc. 60-1 at 10.)  He also complained that, about

17  two weeks prior, he had been examined by a provider for an infection above his left eye,

18  which the provider diagnosed as inflammation of fatty tissue.  (*Id.*)  He requested to be

19  seen by an ear, nose, and throat specialist (ENT) so that "proper medical treatment can be

20  rendered."  (*Id.*)  He reported having chills, dizziness, frequent migraine headaches, and

21  loss of vision, and requested to be seen on an emergency basis.  (*Id.*)  RN Maurice Owiti

22  reviewed the HNR on December 31, 2015 and referred Newman to the nurse line; other

23  staff notes dated January 30, 2016 state, "seen on nurse line" and "nurse line referred to

24  doctor's line.  Scheduled."  (*Id.*)

25      On January 14, 2016, Newman was seen by RN Owiti for a scheduled "sick call,"

26  and Owiti examined him and noted "Pt. denies any pain at this time."  (Doc. 60 ¶ 4;

27  ―――――――――――――

28      [1] The citation refers to the document and page number generated by the Court's
    Case Management/Electronic Case Filing system.

Doc. 60-1 at 12.) Owiti also noted that Newman complained of a bump on the left eyebrow that Newman stated was due to a rare sinus condition for which he had previously had two surgeries, which had left his right eye blind and his left eye unstable. (Doc. 60-1 at 13.) Newman told Owiti that, due to this condition, he gets partial seizures, dizzy spells, recurrent infections, and now the bump, which he believed was increasing in size and wanted to know why. (*Id.*) Owiti noted "[b]ump on left eyebrow is the size of a golf ball . . . soft and non-tender. Pt. not in any distress." (*Id.*)

On February 10, 2016, Newman filed another HNR, this time reporting that he had been told "about a month ago" that he would be seen by a provider for his swollen eyes and infectious disease above his left eye, but no one had seen him and he was now having "blurred vision, non-stop headaches, chills and dizziness" and needed proper treatment. (Doc. 60-1 at 17.) He again requested to see an ENT. (*Id.*)

On February 15, 2016, Newman was again seen by RN Owiti for a scheduled sick call, and he reported lower back pain related to a vehicle accident five years before. (*Id.* at 18−19.) He also complained about severe pain above his left eye and yellowish-brown and greenish discharge coming out of his nose and eyes, for which he was still waiting to see a provider. (Doc. 68 ¶ 6.) The Health Service Encounter notes from this visit do not contain this information or report any additional issues with the bump. (Doc. 60 ¶ 6; Doc. 60-1 at 18−22.)

On February 18, 2016, Newman saw Brower for a scheduled sick call regarding the bump over his left eye, and Brower noted that Newman had returned to prison in September 2015 and, before that, had been seeing an ENT and was being worked up for surgery but had not been seen again for 8−9 months. (Doc. 60-1 at 24.) Brower further noted that Newman complained of "enlarged swelling on forehead about the size of a huge steelie marble which is protruding from forehead"; was "completely blind in Rt. Eye" due to an infection in 2011−2012, which caused blindness; reported that the newer swelling was similar in appearance to the one that had caused his blindness; and requested an urgent ENT visit. (*Id.*) Brower made no assessments at that time. (*Id.* at 25.)

On February 19, 2016, Newman again saw Brower for follow up, and Brower additionally noted that Newman had received "extensive surgery to reconstruct his face d/t the growth of MRSA behind the bone/frontal sinuses"; had "large healed scars across most of forehead/brow bilaterally"; and the prior surgery and blindness in the right eye were obvious. (*Id.* at 28.) He noted that Newman was "very concerned" about a possible recurrence of the same issue, now above the left eye, and that the new area was "only mildly painful to palpation." (*Id.*) Brower found the swelling was "NOT moveable/malleable, almost bony. Does NOT appear to be an abscess nor with a pustular core," and he recommended an ENT evaluation. (*Id.* at 29.) Brower's plan notes state that he "submitted email to Dr. Alvey for URGENT authorization" and that he submitted a routine ENT consult for which he was awaiting an email response "to then change to URGENT if authorized." (*Id.* at 31.) Brower also ordered an eye patch for Newman's right eye. (*Id.*)

On February 23, 2016, Brower spoke to Dr. Alvey about Newman's case, and Brower and Alvey agreed to send Newman to the emergency room for a CT scan and emergency ENT evaluation. (Doc. 60 ¶ 8.) After calling Florence Anthem Hospital and finding out it did not have an ENT on staff, Brower had Newman taken by prison van to the emergency room at Mountain Vista Medical Center (MVMC). (*Id.*) Newman was admitted the same day, and Dr. Kevin Craig, M.D., diagnosed him with acute recurrent frontal sinusitis, for which he provided discharge instructions and recommended follow up with a private physician for continuance of care. (*Id.*; Doc. 60-2 at 5, 13−14.) According to Newman, after his CT scan, Craig read him the results, which were that the "sinus infection is life-threatening, and surgery would need to be done immediately or [he] could possibly die within a week." (Doc. 13 at 7.)

The radiologist's report of the CT scan indicated "[c]omplex left frontal mucocele with extension and mass effect on the left frontal lobe. There is also protrusion of the mucocele anteriorly from the anterior frontal sinus wall defect. The lesion contain[s]

increasd density may suggest proteinaceous material, hemorrhage or fungal infection." (Doc. 60-2 at 10.)  The radiologist recommended an MRI for further evaluation.  (*Id.*)

On February 24, 2016, Newman returned to ASPC-Eyman, South Unit, and RN Alicia Zaremba called the hospital for a report.  (Doc. 60 ¶ 10.)  MVMC staff reported that Newman's blood work came back normal, his CT scan showed a sinus infection, and he was to follow up with a provider.  (*Id.*; Doc. 60-2 at 17.)  Newman reported 10/10 headache pain, and Zaremba referred him to a provider.  (Doc. 60-2 at 18−19.)

On or about February 25, 2016, Newman filed an HNR in which he reported being taken to the ER and given a CT scan, whereupon he "was told [he] had a mucus seal touching [his] brain and . . . had 4 days to 2 weeks to get surgery or [he] could end up dead."  (*Id.* at 21.)  He complained that he had not received any medication, the doctor refused to admit him, and since returning to prison, he had been losing consciousness and feeling disoriented.  (*Id.*)  He also claimed that he had been given a paper "with a Dr. Chang Steven . . . and [was] told [Dr. Chang Steven] would provide care since Mountain Vista was unqualified in brain and n[eu]ral surgery procedures."  (*Id.*)

That same day, Newman was seen by Brower for follow up, and he told Brower that the "brain doctor" at MVMC told him his CT scan showed he had an infection that was pressing down on his brain and, if not removed in the next 4 to14 days, he could die.  (*Id.* at 23.)  Brower noted that the hospital discharge records showed "very little information on what transpired," and he contacted MVMC to obtain the full records of Newman's visit. (*Id.*)  Brower then collaborated with Dr. Alvey, and Dr. Alvey recommended contacting Dr. D'Silva at MVMC to re-admit Newman for evaluation.  (*Id.* at 24.)  Upon discussion with Dr. D'Silva and further consultation with Dr. Alvey, Brower arranged, instead, for Newman to be admitted to St. Joseph Hospital to receive care from Dr Nader Sanai, M.D., a brain tumor specialist.  (*Id.*)  That same day, Newman was admitted to St. Joseph's Hospital.  (Doc. 60 ¶ 13.)

On February 26, 2016, Newman was seen by Dr. Sanai, who examined him and scheduled him for cranio-orbital exenteration surgery, which Dr. Sanai performed on February 29, 2016.  (*Id.* ¶ 14; Doc. 60-2 at 38−39.)

On March 7, 2016, Newman was discharged from St. Joseph's Hospital and admitted to the prison infirmary.  (Doc. 60 ¶¶ 16−17.)  Newman's Patient Discharge Instructions show he was diagnosed with "1: Mucocele of frontal sinus; 2: Benign essential HTN; 3: Sudden visual loss, left eye; Compression of optic nerve of both eyes; [and] Mucocele of frontal sinus."  (Doc. 60-2 at 41.)  The hospital Follow-up Instructions called for him to see Dr. Sanai "within 1 to 2 weeks."  (*Id.*)  Newman also received prescriptions for Acetaminophen-Oxycodone for pain, Amoxicillin-Clavulanate, Docusate Senna, Famotidine, Polyethylene Glycol for constipation, and Ciprofloxacin.  (*Id.* at 42.)  After Newman was admitted to the infirmary, Dr. Johnson prescribed Omeprazole, Lactulose, Docusate Sodium, Ciprofloxacin, Buspirone, Amoxicillin, Atenolol, and Codeine/APAP (Tylenol 3).  (Doc. 60 ¶¶ 16−18.)

On March 8, 2016, Nurse Practitioner (NP) Deborah McGarry saw Newman in the infirmary, and she ordered that his staples be removed in 7 to10 days and requested an urgent offsite post-op visit with Dr. Sanai.  (*Id.* ¶ 19; Doc. 60-3 at 33.)  On March 10, 2016, Plaintiff was taken to an ENT for evaluation, and the ENT noted "Pt needs to follow up with his surgeon."  (Doc. 68-1 at 28.)

On March 11, 2016, NP McGarry discharged Newman from the infirmary, noting that his incision was healing well, he had no signs of infection, and his headaches were managed with medications.  (Doc. 60 ¶ 20.)  On March 17, 2016, Newman saw Brower, and Brower removed some of his sutures and left others in place to maintain closure.  (*Id.* ¶ 21.)

On April 25, 2016, Newman saw Dr. Sanai at Barrow Brain and Spine for follow up, and Dr. Sanai removed Newman's remaining sutures.  (*Id.* ¶ 22; Doc. 60-4 at 15.)  Newman complained of headaches and pain, and Dr. Sanai prescribed ice; 60 Vicodin 5-300 mg tablets, to be taken every six hours for pain; and Erythromycin ointment for both

eyes; he also requested an ophthalmology referral and recommended follow-up imaging in one year. (Doc. 60 ¶ 22; Doc. 60-4 at 18.) Upon Newman's return to prison, RN Owiti called Dr. Sanai for instructions, and that same day, NP Dorothy Igwe ordered Tobramycin ophthalmic solution and Codeine/APAP for 5 days. (Doc. 60 ¶¶ 23, 24; Doc. 60-4 at 21−22.)

On May 1, 2016, Newman filed an HNR in which he complained that, instead of providing the care Dr. Sanai had prescribed, the Medical Unit did not give him ice and gave him Tylenol 3 for 5 days instead of Vicodin for 15 days. (Doc. 68 ¶ 23; Doc. 60-4 at 29.) RN Owiti responded on the HNR that "The provider changed your orders to include T3's and Tobramycin eye drops." (Doc. 60-4 at 29.)

On May 20, 2016, Newman saw NP Paul Denehy for follow up, and he reported intermittent pain over the surgical site—sometimes sharp, sometimes aching—that could be a 9/10 and could last for about one hour. (Doc. 60 ¶ 26; Doc. 60-5 at 2.) Newman requested Vicodin and informed Denehy that Dr. Sanai had prescribed Vicodin for 30 days, but Denehy saw no record of this. (Doc. 60-5 at 2.) Denehy noted that "[w]hen asked why he has waited so long (over one month to report his pain), he adds that he has done 2 HNRs on the topic." (*Id.*) Denehy requested Dr. Sanai's notes from either March 16, or April 16, 2016 and planned to follow up once received, and he ordered Meloxicam 7.5 mg twice a day for 30 days for pain. (*Id.* at 5, 7.)

On August 24, 2016, Newman saw NP Denehy in the Chronic Care Clinic for his hypertension, which Denehy noted was in "good control." (Doc. 60 ¶ 27; Doc. 60-5 at 10−16.) Denehy also noted that Newman was "doing quite well" and was to follow up in Chronic Care in 6 months. (Doc. 60-5 at 15.) At this visit, Newman did not make any complaints about his head, sinus, or eye issues. (Doc. 60 ¶ 27.)[2] At his next chronic care

---

[2] Newman points out that his Chronic Care visit was for his hypertension—by which he appears to explain why he did not raise issues related to his head, sinuses, and eyes— and he objects that some of the entries in this Chronic Care record are incomplete, with some required boxes not being checked, which he claims is in violation of Corizon's policies and procedures and the Settlement Agreement in the separate class action lawsuit,

visit with NP Hamda Awaal on March 9, 2017, Newman denied headaches or dizziness and stated he was doing fine.  (Doc. 60 ¶ 29.)

On February 23, 2017, NP Denehy submitted a Consult Request for Newman to have an MRI, and on March 13, 2017, Newman was taken to AZ-Tech Radiology for the MRI.  (Doc. 60 ¶¶ 28, 30.)  Dr. Maurice Davidson reviewed the MRI and noted well-contained fluid; no evidence of edema, fluid collection, or mass; Newman's optic nerves were satisfactory; and there was evidence of chronic sinusitis.  (*Id.* ¶ 30.)

On May 9, 2017, Newman had an off-site visit with Dr. Sanai at Barrow Brain and Spine, and partial notes from this visit state "per Dr. Sanai, Patient was refered [sic] to ID [infectious disease].  No further follow up needed."  (Doc. 60 ¶ 32; Doc 60-6 at 21−22.)[3] Copies of a referral, faxed from Barrow Brain and Spine to provider Ahmad Aldeiri, M.D., on May 25, 2017, and again on July 5, 2017, show that Dr. Sanai referred Newman for an

*Parsons v. Ryan*, but Newman does not materially dispute any of the content of this Chronic Care record.  (Doc. 68 ¶ 27.)

[3] Corizon's Statement of Facts does not include Newman's May 9, 2017 visit to Dr. Sanai or show that Newman had any medical encounters in the nine months between March 13, 2017—when Dr. Davidson reviewed his follow-up MRI—and December 14, 2017—when, according to Corizon's facts, he was next seen on the nurse line for a sore throat.  (*See* Doc. 60 ¶ 30−33.)  In addition to this gap, Corizon does not refer to or produce any substantive records of Dr. Sanai's findings on May 9, 2017, even though it appears from the single-page attachment Corizon produced that this was only one of eleven pages sent from Dr. Sanai.  (*See* Doc. 60-6 at 22.)  Corizon claims only that Dr. Sanai opined on May 25, 2017—apparently without seeing Newman for over a year—that no further follow up was needed.  (*Id.* ¶ 31.)  Then, without explanation, on July 5, 2017, Dr. Sanai sent Corizon detailed notes of Newman's initial April 25, 2016 post-op visit, which had occurred more than a year earlier.  (*Id.* ¶ 32; *see* Doc. 60-4 at 15−19.)  The evidence does not support Corizon's factual assertions.  First, the single page of correspondence from Dr. Sanai which Corizon cites as showing that Dr. Sanai sent detailed notes of Newman's April 25, 2016 visit to Corizon on July 5, 2017 lists the date of service as May 9, 2017, not April 25, 2016.  (*See* Doc. 60-6 at 22.)  Additionally, Corizon does not explain why Dr. Sanai would have only then sent the notes from Newman's April 25, 2016 post-op visit but not include any notes from his most recent visit on May 9, 2017.  Corizon also omits from its Statement of Facts that, before opining "no further follow up needed," Dr. Sanai referred Newman to an infectious disease specialist (*see id.*), and Dr. Sanai's office faxed at least two referral forms to Dr. Ahmad Aldeiri, M.D., at Arizona Pulmonary Specialists.  (Doc. 68 at 43−44.)

infectious disease consultation on April 14, 2017, with notes to "Contact David at ASPC to schedule appointment." (Doc. 68 at 43−44.) Additional notes on the referral faxed on May 25, 2017 state: "Faxed referral with notes and demographic information 04/14/17," and "Left message with Nikki at ID to call back with status of appt. for this patient 05/25/17." (*Id.* at 44.) Additional notes on the copy faxed on July 5, 2017 state, "Spoke w/ Nikki, office never received fax. Faxed referral with notes again. . . . 05/25/17," and "Spoke with Nikki, they are just waiting for auth from David at ASPC to schedule appt 06/09/17." (*Id.* at 43.)

On July 12, 2017, an outside Consultation Request was created for Newman to see an off-site ENT based on "chronic sinusitis. Cyst found on MRI testing." (Doc. 68-1 at 29.)[4] The "Procedure Requested Comments" section of the request refers to "infectious disease consult request−dx chronic sinusitis with mucocele" and notes, "request changed to ENT." (*Id.*) It also notes "Please see Barrow Brain and Spine MRI of Brain Report of 7/05/17." (*Id.*) The "Action Taken" section shows that this request was referred to the UM Team for Review on August 17, 2017; external consults were scheduled on August 29, 2017 and October 25, 2017; and the consult was completed on December 7, 2017. (*Id.*)[5]

---

[4] Corizon does not include this evidence in its Statement of Facts, and Newman's copy of the Condensed Consultation Request is missing the second page, which would presumably continue the reverse chronology of actions taken with respect to this request, going back to how it originated. Thus, it is not clear from the available evidence who submitted this request or their basis for doing so. The timing of the request and its reference to an infectious disease consult suggest that the request was made in response to Dr. Sanai's ID referral.

[5] It is not clear what, if anything, occurred on these dates. As previously noted, Corizon did not include facts in its Statement of Facts about any medical encounters Newman had from the time of his MRI on May 25, 2017 until December 14, 2017, even though other evidence shows Newman received off-site medical care during that time. Based on the evidence Newman produces, Newman was taken to two off-site visits to see Dr. Michael D. Guttenplan, M.D. on September 29, 2017 and November 17, 2017, both of which took place without Dr. Guttenplan having the relevant medical records, which Corizon staff failed to send. (Doc. 68-1 at 25−27.) Dr. Guttenplan's area of specialty is also not clear from the available evidence; nor is it clear if Newman's visits to him were the basis for finding the "consultation completed" on December 7, 2017. But as discussed

A separate Consult Request Action shows that NP McGarry's earlier, March 8, 2016, Consultation Request for Newman to receive an off-site neuro surgery visit was closed on November 9, 2017 by Corizon staff member Rodney Stewart, M.D., who noted at that time, "Patient dismissed from neurosurgery care; no further action needed." (*Id.* at 30.)

On September 29, 2017, Newman was seen by Michael D. Guttenplan, M.D., but no records were sent with Newman to this visit, and Dr. Guttenplan noted "he comes in today for unclear reasons." (Doc. 68-1 at 25.) Newman described his history of rhinosinusitis with multiple surgeries to Dr. Guttenplan, and Dr. Guttenplan's exam showed "extensive exenteration of the nasal cavity" and "a very well healed cavity in which one can completely see all the ethmoids and maxillary sinus." (*Id.*) Dr. Guttenplan found no polyps, inflammation, or infection, and diagnosed "chronic sinusitis of unclear etiology." (*Id.*) He further noted

> The patient must be sent with adequate records. These would include the prior surgery he had in 2016, including the 2017 MRI scan report. Also one must question why he is not following up with the surgeon who did his most recent surgery in 2016. We attempted to call the facility to get information but were unable to get that information at the time of his visit to allow for adequate prompt care. We will see him back in consultation when appropriate materials are available to us. In the meantime I have recommended that he use sinus rinse and have included a brochure.

(*Id.*) In an addendum, Dr. Guttenplan further noted

> I received records and he has a lesion in his right supra frontal region. He has had a bony resection there before and this abuts the dura and frontal lobe. He was treated in the past by Dr. Sanai at Barrow and I think that would be the appropriate place for follow up for evaluation and treatment of this lesion as well. I think this would fall out of a traditional sinus surgery at this point.

(*Id.*)

above, it appears from the minimal evidence of those visits that Dr. Guttenplan did not believe he had the necessary expertise to assess Newman's ongoing sinus needs. (*See id.*)

On November 17, 2017, Newman was again sent to Dr. Guttenplan, and the Consultation Report from that visit shows that Dr. Guttenplan noted that Newman's March 2017 MRI "showed [right] supraorbital lesion," but Dr. Guttenplan also wrote in large letters "NO MRI from 7-5-17 as requested to Corizon," and he wrote in the follow-up section, "if no report of 7-5-17 do not send." (*Id.* at 27.)

On December 14, 2017, Newman saw NP Igwe for a sore throat, occasional cough, and yellow nasal drainage. (Doc. 60 ¶ 33.) He denied fever, chills, and shortness of breath. (*Id.*) Upon exam, Igwe noted no tonsillar exudate, edema, or erythema, and that Newman's exam was otherwise normal. (*Id.*) Igwe prescribed Amoxicillin, nasal spray, and Cetirizine 10 mg to treat Newman's sore throat and nasal symptoms due to his chronic sinusitis. (*Id.*)

On February 13, 2018, Newman submitted an Emergency HNR, complaining of "excruciating pain in head going in and out of contious [sic] chills pain in eyes and head, need something for pain and to see a[n] outside doctor." (Doc. 60-6 at 34.) He was seen on the nurse line and referred to a provider. (*Id.*)

On February 19, 2018, Newman again saw NP Igwe, and he reported headaches two times a week, greenish-yellowish discharge, facial pressure, fever, and chills. (Doc. 60 ¶ 35.) Newman reported he was too sick to work and requested a special needs order (SNO) for time off work and to see an ENT. (*Id.*; Doc. 60-6 at 36.) Igwe noted that "Head atraumatic, normo cephalic with old well-healed surgical scar." (Doc. 60-6 at 36.) She did not observe a yellow discharge, but Newman brought in a small plastic bag of what appeared to be greenish yellow mucus. (*Id.*) Igwe's plan notes included Augmentin 500 mg for 7 days; an SNO for no duty for 3 days, and "[a]wait neuro consult as scheduled." (*Id.* at 39.)

On April 28, 2018, Newman submitted an HNR requesting to see an eye doctor because his "vision [was] deteriorating" and he still had not been seen "as ordered by surgeon 2016." (Doc. 60-7 at 6.) That same day, Newman saw RN Owiti, and Owiti conducted a Snellen eye test and determined Newman had 20/50 vision in the left eye, 20/40 in the right eye, and 20/40 using both eyes. (*Id.* at 9.) Owiti completed a routine

Consult Request for Newman to receive an optometry visit at the on-site clinic. (*Id.* at 10, 13.)

On May 7, 2018, Newman saw optometrist Margaret Salas at the on-site clinic for clinical findings, and the Consult Request was marked as completed. (*Id.* at 13, 14.) There are no reports on the record of Salas' findings or of any prescribed care.

On June 23, 2018, Newman submitted an HNR, complaining of double vision and redness of eyes, bad vision, and "infection yellow discharge." (*Id.* at 17.) That same day, Newman saw RN Kacey Shipp, and Shipp noted that his eyes were red but there was no discharge and that Newman "reports this is an issue he has been dealing with for years now." (*Id.* at 19−20.) She referred Newman to a provider and educated him to use good hygiene, stay hydrated, and keep follow-up appointments. (*Id.* at 22.)

On September 4, 2018, Newman submitted an HNR, requesting to be seen by an eye specialist because his vision was "extremely altered" and to have prescription eyeglasses. (*Id.* at 25.) He claimed that this was his fifth request and he had not yet been seen. (*Id.*)

On September 6, 2018, Newman saw RN Owiti for complaints of decreased vision and being unable to see clearly since his 2016 surgery for sinus infection. (*Id.* at 27.) Owiti conducted a Snellen eye test, and the results again showed 20/50 vision in the left eye, 20/40 vision in the right eye, and 20/40 vision using both eyes. (*Id.*) Owiti again referred Newman to the optometrist for evaluation. (*Id.* at 29.)

On September 25, 2018, Newman saw NP Igwe, and he reported yellow greenish discharge from his eyes and nose for the past 2.5 to 3 years as well as chills and frequent headaches and that he had a brain tumor 3 years ago with brain surgeries in 1997 and 2016. (*Id.* at 34.) Upon exam, Igwe noted, in relevant part, "head, atraumatic normocephalic," the right eye was "nonreactive to light," "no tonsillar exudate, erythema or edema," and "well-healed old surgical scar on face around eyebrow area." (*Id.* at 34.) Igwi assessed chronic sinusitis that was stable without evidence of inflammation at the time and conjunctivitis. (*Id.* at 36.) She ordered Erythromycin ophthalmic ointment for 5 days,

Ketotifen ophthalmic for each eye for 7 days, a sputum culture, an offsite neurology consult for further evaluation and treatment of chronic sinusitis and brain tumor, and she renewed Newman's SNO for a lower bunk. (*Id.* at 37.)

On September 29, 2018, Newman had an onsite optometry appointment and was prescribed eyeglasses, which he received on November 12, 2018. (*Id.* at 48, 49.)

On October 2, 2018, Newman had a lab test of his sputum, and the results came back normal, which indicated to NP Igwe that he did not have a bacterial infection and his chronic sinusitis was stable. (*Id.* at 46; Doc. 60-6, Ex. 37 (Igwe Decl.) ¶ 9.)

## IV.    Discussion

To support a § 1983 claim against a private entity performing a traditional public function, such as providing medical care to prisoners, a plaintiff must allege facts to support that his constitutional rights were violated as a result of a policy, decision, or custom promulgated or endorsed by the private entity. *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138–39 (9th Cir. 2012) (extending the "official policy" requirement for municipal liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978), to private entities acting under color of law). Under *Monell*, a plaintiff must show: (1) he suffered a constitutional injury; (2) the entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional injury. *See Monell*, 436 U.S. at 691–94; *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001).

### A.    Constitutional Injury

To prevail on an Eighth Amendment medical care claim, a prisoner must demonstrate "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). There are two prongs to this analysis: an objective prong and a subjective prong. First, a prisoner must show a "serious medical need." *Jett*, 439 F.3d at 1096 (citations omitted). Examples of indications that a prisoner has a serious medical need include "[t]he existence of an

injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *McGuckin*, 974 F.2d at 1059−60.

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent. *Jett*, 439 F.3d at 1096. An official acts with deliberate indifference if he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment," *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir.2002) (internal citations and quotation marks omitted), or when they fail to respond to a prisoner's pain or possible medical need. *Jett*, 439 F.3d at 1096. An inadvertent failure to provide adequate medical care or negligence in diagnosing or treating a medical condition does not support an Eighth Amendment claim. *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (citations omitted); *see Estelle*, 429 U.S. at 106 (negligence does not rise to the level of a constitutional violation). Further, a mere difference in medical opinion does not establish deliberate indifference. *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996).

Even if deliberate indifference is shown, to support an Eighth Amendment claim, the prisoner must demonstrate harm caused by the indifference. *Jett*, 439 F.3d at 1096; *see Hunt v. Dental Dep' t*, 865 F.2d 198, 200 (9th Cir. 1989) (delay in providing medical treatment does not constitute Eighth Amendment violation unless delay was harmful).

### 1.    Serious Medical Need

Corizon makes no argument that Newman did not have a serious medical need. (*See* Doc. 59 at 7−8.) There can be no dispute that Newman's brain tumor, which required surgery, and his chronic and ongoing sinus issues, headaches, and vision impairment were conditions worthy of evaluation and treatment and, absent treatment, could result in

significant injury or unnecessary pain.  *See McGuckin*, 974 at 1059–60.  The serious medical needs part of Newman's claim is therefore met.

### 2.    Deliberate Indifference

Corizon argues that Newman cannot show deliberate indifference to any of his serious medical needs.  It first argues that Newman cannot make this showing with respect to the medical care he initially received for the bump on his forehead because Newman was seen by medical staff "within a few weeks" of his HNR, and when Brower saw Newman and determined he needed immediate treatment, he facilitated Newman's transport to the ER and his subsequent admission to St. Joseph's hospital for neurosurgery.  (Doc. 59 at 8.)  Corizon also argues, based on *Shapley v. Nevada Board. of State Prison Commissioners*, that the delay in treatment following Brower's initial misdiagnosis does not show a constitutional violation because a mere delay in care does not rise to the level of deliberate indifference.  *See* 766 F.2d 404, 407 (9th Cir. 1985) ("mere delay of surgery, without more, is insufficient to state a claim of deliberate medical indifference; . . . [the plaintiff] would have . . . no claim for deliberate medical indifference unless the denial was harmful.")

Corizon has not met its initial burden of showing that Newman did not suffer a constitutional violation with respect to the care he initially received for the bump above his left eyebrow.  Corizon is correct that after Brower saw Newman the second time on February 18, 2016, Brower ensured that Newman was brought to the ER four days later for specialist evaluation and treatment and was later admitted to St. Joseph's hospital for surgery. (Doc. 60 ¶¶ 7−9.)  But Corizon misconstrues the basis of Newman's claim, which is not that he did not eventually receive a proper response to his Emergency HNR, but that Corizon did not follow its own guidelines in this instance, which require medical staff to respond to emergent needs within 24 hours. (*See* Doc. 13 at 4.)  Newman relevantly alleged in his Complaint that, despite his filing an Emergency HNR on December 29, 2015 and being told then, and during at least two subsequent nurse line visits, that he had been referred to the doctor's line for proper treatment, it took nearly two months and a second

HNR before Newman was seen by a provider (Brower) who was qualified to diagnose and refer Newman for specialist care. (Doc. 13 at 4−5.) Although Corizon's alleged failure to follow its own guidelines does not necessarily amount to a constitutional violation, absent any facts or discussion as to why Newman was not seen on an emergent basis after repeatedly complaining about the bump and accompanying chills, dizziness, vision loss, and migraine headaches, a reasonable jury could conclude that the two-month delay before Newman saw a provider amounted to deliberate indifference and caused Newman to suffer needless ongoing pain. *McGuckin*, 974 F.2d at 1059−60. ("the presence of a medical condition that significantly affects an individual's daily activities" or "the existence of chronic and substantial pain" constitute serious medical needs.)

Corizon also argues that Newman cannot show deliberate indifference with respect to the follow-up care he received after his brain surgery because, the day after Newman returned from the hospital, NP McGarry submitted an urgent consult request for Newman to have a follow-up appointment with Dr. Sanai; six weeks after his surgery, Newman saw Dr. Sanai; a year later, Newman had an updated MRI, as Dr. Sanai had requested; and Dr. Sanai indicated that no further follow up was needed. (Doc. 59. at 8−9.) Corizon argues that there is no evidence Dr. Sanai was missing medical records or needed them for further treatment. (*Id.* at 9.) Corizon also argues that Newman's complaints of sustained headaches and other ongoing symptoms do not show that anyone was deliberately indifferent to his serious medical needs because Corizon providers consistently responded to these complaints, including that NP Igwe examined Newman on multiple occasions, tested him for infection, and prescribed multiple medications to treat his symptoms. (*Id.*)

Corizon fails to show a lack of genuine dispute that Newman received proper follow-up care after his brain surgery. Corizon is correct that the evidence shows Newman was immediately referred for a follow up visit with Dr. Sanai. But Dr. Sanai ordered follow up within 1 or 2 weeks, and Newman was not seen until 6 weeks later. Although Newman was given a follow-up MRI a year later, as Dr. Sanai had prescribed, Corizon misrepresents Dr. Sanai's findings at that time. The evidence Corizon relies on to show that no further

follow up was needed shows that Dr. Sanai made this assessment only after referring Newman to an infectious disease specialist, and additional evidence shows that Dr. Sanai's office faxed referrals to Dr. Aldeiri for Newman to receive this care. Internal notes made on these documents also support that the referral was received and Dr. Aldeiri was awaiting authorization by Corizon staff. (Doc. 60 ¶ 32; Doc. 60-4 at 21−22; Doc. 68 at 43−44.) Corizon simply does not address Dr. Sanai's May 9, 2017 referral to an ID specialist or present any evidence as to why it was not followed, including why it appears it was subsequently changed to an ENT referral instead of an ID referral as Dr. Sanai had requested. (*See* Doc. 68-1 at 29.)

Corizon also fails to address why Newman was not rescheduled with Dr. Guttenplan following Corizon's repeated failures to send Newman's medical records along with transportation staff on his scheduled visits. Newman alleged in his Complaint that he had "three follow ups with neurosurgeon specialists which ha[ve] all been cancelled" because "Corizon staff did not send medical reports with [Newman's] transport officers to any of the three follow up appointments." (Doc. 13 at 5.) He added that the neurosurgeons and transportation staff called Corizon South Unit Medical to ask for these records and Corizon "would not even fax over the medical records due to medical records could not be located." (*Id.*) Newman additionally alleged that this issue persisted, even after Corizon was repeatedly notified of the problem. (*Id.*) For example, he alleged that, in response to an Informal Complaint/Grievance he filed on this issue, a Corizon supervisor responded on October 24, 2017 that the Clinical Coordinator had been directed to reschedule Newman's visits and send his medical records. But Newman was not rescheduled. (*Id.*) Then, when Newman filed more Informal Complaints/Grievances on January 21, 2018 and February 12, 2018, he received a response on March 6, 2018 that he was "to await to see a neurosurgeon." (*Id.*) Even so, as of the filing of Newman's Second Amended Complaint on August 17, 2018, Newman had still not been seen, even though he alleged he continued to have greenish-yellow discharge, loss of vision, and extreme headaches, sometimes lasting whole days. (*Id.* at 5−6.)

Corizon also does not discuss or produce any evidence that anyone followed up on Dr. Guttenplan's finding in September/November, 2017 that Newman had "a lesion in his right supra frontal region" for which he recommended Newman be returned to Dr. Sanai for further evaluation and treatment, finding that "this [issue] would fall out of a traditional sinus surgery at this point." (*See* Doc. 68-1 at 25.) Additionally, Corizon fails to discuss NP Igwe's February 19, 2018 plan notes in response to Newman's complaints of headaches two times a week, greenish-yellowish discharge, facial pressure, fever, and chills, in which Igwe, in addition to prescribing medications, called for Newman to "[a]wait neuro consult as scheduled." (*See* Doc. 60 ¶ 35; Doc. 60-6 at 36, 39.) Corizon does not acknowledge or produce any evidence that Newman ever had this consultation, which the evidence shows Igwe again referred to in her plan notes seven month later, on September 25, 2018, in response to Newman's continued sinus complaints, including yellow-greenish discharge from his eyes and nose, chills, and frequent headaches over the past 2 1/2 to 3 years. (*See* Doc. 60-7 at 34, 37.)

Deliberate indifference is exhibited where a plaintiff demonstrates that medical staff chose a course of treatment that was "medically unacceptable under the circumstances" and "that they chose this course in conscious disregard of an excessive risk to [the prisoner's] health." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996); *see Jett*, 439 F.3d at 1097–98 (jury could find deliberate indifference where the prison doctor was aware that the plaintiff needed to see an orthopedist for treatment and the plaintiff was not taken to the orthopedist for 6 months). The Ninth Circuit and other courts have routinely found that failure to follow a treating specialist's or even a treating physician's recommendation may amount to a course of treatment that is medically unacceptable. *See Colwell v. Bannister*, 763 F.3d 1060, 1069 (9th Cir. 2014) (denying summary judgment where prison officials "ignored the recommendations of treating specialists and instead relied on the opinions of non-specialist and non-treating medical officials who made decisions based on an administrative policy"); *Snow v. McDaniel*, 681 F.3d 978, 988 (9th Cir. 2012) (where the treating physician and specialist recommended surgery, a reasonable jury could

conclude that it was medically unacceptable for the non-treating, non-specialist physicians to deny recommendations for surgery), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014); *Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999) (the defendant physician's refusal to follow the advice of treating specialists could constitute deliberate indifference to serious medical needs); *McNearney v. Wash. Dep't of Corrs.*, C11-5930 RBL/KLS, 2012 WL 3545267, at *26 (W.D. Wash. June 15, 2012) (in granting a preliminary injunction for specialist treatment, the district court found that the prisoner plaintiff showed a likelihood of success on the merits of her Eighth Amendment claim where the defendants failed to follow an orthopedic surgeon's strong recommendation for further orthopedic evaluation).

In this case, Corizon simply does not address or present any evidence to refute that, for more than two years after Newman's last visit with Dr. Sanai, Newman has not been properly evaluated by an outside specialist in follow up for his brain surgery and sinus issues, despite his ongoing symptoms and complaints and despite clear recommendations from Dr. Sanai and Dr. Guttenplan that he receive further specialist care. On this record, Corizon's argument that Newman was regularly seen by medical staff for his sinus complaints, and he received a culture test and medications from NP Igwe, is utterly ineffective and does not prevent a finding of deliberate indifference. *See Lopez v. Smith*, 203 F.3d 1122, 1132 (9th Cir. 2000) (prisoner does not have to prove that he was completely denied medical care).

Lastly, Corizon argues that Newman cannot show that anyone was deliberately indifferent to his vision-related complaints because, both times Newman requested to see an eye doctor, he was evaluated by RN Owiti and referred to optometry, and he thereafter saw optometry and received glasses. (Doc. 59 at 9.) As it previously argued with respect to Newman's brain surgery, Corizon once again relies only on conclusory assertions that Newman ultimately received the requested care. It may be undisputed that Newman received glasses—in this case, only after he filed his Second Amended Complaint—but this fact does not demonstrate a lack of deliberate indifference to Newman's repeated eye

and vision complaints, particularly after Dr. Sanai recommended after Newman's brain surgery two years earlier that Newman receive an ophthalmology referral, and there is no evidence Corizon took any action in response. (*See* Doc. 60-4 at 18.) In brief, the evidence shows that, on April 28, 2018, Newman submitted an HNR requesting to see an eye doctor because his "vision [was] deteriorating" and he still had not been seen "as ordered by surgeon 2016." (Doc. 60-7 at 6.) Newman then saw RN Owiti, and she determined he had, at most, 20/40 vision. (*Id.* at 9.) Although it is undisputed that Owiti then completed a Consult Request for Newman to receive an optometry visit at the on-site clinic, and on May 7, 2018, Newman was seen by optometrist Margaret Salas, Corizon fails to produce any evidence that Salas examined Newman's eyes, made any findings, or prescribed any care. (*Id.* at 10, 13.) Instead, the evidence shows that Newman continued to complain about his eyes and to make repeated requests for glasses or other care over the next four months, including at a June 23, 2018 nursing visit, in a September 4, 2018 HNR, and at a September 6, 2018 repeat nursing visit with Owiti, in which his vision test showed the same results. Even though Newman was again referred for and had a second optometry visit September 29, 2018, and he received his glasses on November 12, 2018, the record shows that he never saw an ophthalmologist. A reasonable jury could find that Corizon's failure to follow up on Dr. Sanai's recommendation in 2016, followed by its failure to provide glasses for another six months in 2018, despite Newman's repeated visits to Corizon healthcare providers and a previous visit to the on-site optometry clinic, amounts to deliberate indifference to a serious medical need and that the delay in care while Newman's vision was demonstrably impaired caused Newman to suffer unnecessary harm.

Based on the above, there exists a genuine issue of material fact whether Newman suffered a constitutional injury as to both his sinus and vision issues, thereby satisfying the first prong under *Monell*.

### 2. Policy or Custom

A policy is "a deliberate choice to follow a course of action" made by the officials or entity "responsible for establishing final policy with respect to the subject matter in

question." *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992). A policy can be one of action or inaction. *Long v. Cnty. of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006). A "custom" for purposes of municipal liability is a "widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law." *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). While one or two incidents are insufficient to establish a custom or practice, the Ninth Circuit has not established what number of similar incidents would be sufficient to constitute a custom or policy. *See Oyenik v. Corizon Health Inc.*, No. 15-16850, 2017 WL 2628901, at *2 (9th Cir. June 19, 2017) (a reasonable jury could conclude that at least a dozen instances of defendant Corizon denying or delaying consultations and radiation treatment for cancer patient over a year amounts to a custom or practice of deliberate indifference) (citing *Oviatt By & Through Waugh v. Pearce*, 954 F.2d 1470, 1478 (9th Cir. 1992)). But "[t]here is no case law indicating that a custom cannot be inferred from a pattern of behavior toward a single individual." *Id.* Whether actions by entity officers or employees amount to a custom "depends on such factors as how longstanding the practice is, the number and percentage of officials engaged in the practice, and the gravity of the conduct." *Mi Pueblo San Jose, Inc. v. City of Oakland*, C-06-4094 VRW, 2006 WL 2850016, at *4 (N.D. Cal. Oct. 4, 2006)

Corizon argues that Newman cannot show a policy or custom that deprived him of adequate medical care because his medical needs were properly addressed, and the only policy Newman alleges in this action is Corizon's policy of requiring quick responses to HNRs, which does not show deliberate indifference. (Doc. 59 at 9−10.) But as already discussed, Corizon has not met its initial burden of showing that Newman's medical needs were properly addressed. Corizon does not materially dispute, for instance, the two-month delay before Newman saw a provider in response to his emergency HNR about the bump

above his eye; the failure to comply with Dr. Sanai's recommendations for Newman to receive an ID consult; the repeated instances of sending Newman to Dr. Guttenplan without proper medical records; the failures to reschedule Newman with Dr. Guttenplan or any other specialists, as recommended by Dr. Sanai, Dr. Guttenplan, and Corizon's own medical providers; or the two year and six-month delay in addressing Newman's vision impairment. These failures, denials, and delays are also not isolated instances. They occurred over more than two years and involved numerous Corizon employees, suggesting that Newman's experiences were the rule, not the exception. *See Henry v. Cnty. of Shasta*, 132 F.3d 512, 521 (9th Cir. 1997) (finding a policy or "widespread pattern of abuse" more likely where multiple employees were involved in the constitutional violation). Thus, even without an official, written policy, a reasonable jury could conclude that Corizon's delay in providing treatment for Newman's emergency needs and its delays or denials of specialist-recommended care were part of a policy or widespread custom of Corizon to deny or delay proper medical care. *See Gibson v. County of Washoe*, 290 F.3d 1175, 1194–95 (9th Cir. 2002) (whether a policy or custom exists is normally a jury question).

### 3. Deliberately Indifferent Policy/Moving Force

Because deliberate indifference is exhibited where prison officials deny or delay medical treatment and harm results, *see Wood*, 900 F.2d at 1334, a policy or practice that denies or delays specialist and physician-recommended treatment for a serious medical need and thereby causes harm constitutes a deliberately indifferent policy. To establish that a policy or custom is also the "moving force" behind a constitutional violation, a plaintiff must demonstrate a direct causal link between the policy or custom and the constitutional deprivation. *See Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997). The Court has already found a genuine issue of material fact whether Corizon had a policy or custom of denying or delaying treatment, including specialist-recommended care, and that Newman suffered harm in the form of ongoing sinus issues, including greenish-yellowish discharge, headaches, dizziness, and impaired vision, while awaiting proper treatment. On this basis alone, the moving-force element is satisfied. *See*

- 23 -

*Brown*, 520 U.S. at 405 ("the conclusion that the action taken or directed by the [entity] . . . itself violates federal law will also determine that the [entity] action was the moving force behind the injury of which the plaintiff complains"). Accordingly, questions of fact exist as to whether Corizon had a deliberately indifferent policy that deprived Newman of his constitutional right to receive adequate medical care, thereby causing him harm. The Court will deny Corizon's Motion for Summary Judgment.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is **withdrawn** as to Defendant Corizon's Motion for Summary Judgment (Doc. 59), and the Motion is **denied**.

(2)     This action is referred to Magistrate Judge Eileen Willett to conduct a settlement conference.

(3)     Defense counsel shall arrange for the relevant Parties to jointly call Magistrate Judge Willett's chambers at (602) 322-7620 on or before February 18, 2020 to schedule a date for the settlement conference.

Dated this 4th day of February, 2020.

*David G. Campbell*

David G. Campbell
Senior United States District Judge